UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:05CR355ERW(MLM) |
| | ) | |
| TIMOTHY PARSONS, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

This matter is before the court on Defendant's Motion to Suppress Evidence and Statements.
[Doc. 23] The government filed a written Response. [Doc. 26] On 9/28/05 the court held an
Evidentiary Hearing on the Motion. Following the Hearing, defendant requested and was granted
to 10/14/05 to file a Supplemental Memorandum in Support of the Motion. [Doc. 31]   The
government filed a Supplemental Response. [Doc. 32]

At the hearing the government presented the testimony of Sheriff Donald Blankenship and
Detective Kody Lucas, both of the Phelps County Sheriffs Department. The defendant did not
present testimony but introduced several exhibits.[1] Based on the testimony and evidence adduced
and having had an opportunity to observe the demeanor and evaluate the credibility of the
witnesses, the undersigned makes the following findings of fact and conclusions of law.

FINDINGS OF FACT[2]

Sheriff Blankenship testified that prior to his seventeen years as Sheriff of the Phelps County
Sheriff's Department, he had twelve years of law enforcement experience. In his present capacity
he supervises approximately sixty people and supervises the operation of the Sheriff's Department
including law enforcement, process service, the jail and court security. During his twenty-nine years

---

[1]     Because the court file is electronic rather than in paper form, the undersigned has
returned these exhibits to defense counsel. They are available to the district court for review in
connection with this R&R, if requested.

[2]     The transcript of the Evidentiary Hearing is Document 29.

of law enforcement, he has made thousands of traffic stops. He has used narcotics trained canines since 1993. His present canine is "Nitro" who has been with him since 2000.

On June 19, 2005 Sheriff Blankenship was on duty in the late afternoon on the north side of I-44 at the Sugar Tree overpass. The Sheriff's Department has two sets of signs that are placed facing eastbound traffic, one on each side of the Interstate just prior to the Sugar Tree exit. The first says "Checkpoint Ahead, 1/4 mile." The second set says "Drug Dogs in Use." Both signs are in English and Spanish.

Sheriff Blankenship was in uniform on the north side of I-44 in a fully marked patrol car without roof lights but with decals reading "Sheriff" and "Canine" and a phone number.

At approximately 4:15 P.M. a red Pontiac Grand Am with Nevada license plates exited the Sugar Tree exit. It stopped at the top of the ramp then turned right. The road is known as Country Road 7300. Sheriff Blankenship ran the license plate and learned it was a Hertz rental. He followed the vehicle approximately two miles. The male driver was the only occupant of the car. The posted speed limit on the first stretch of the road (approximately 1-1/2 miles) is 45 miles per hour; later it is posted at 35 miles per hour. During the first stretch of the road the defendant was going approximately 45-46 miles per hour and continued at that speed even after it was posted at 35 miles per hour. It is a violation of Missouri Law to exceed a speed limit. R.S.Mo. § 304.010. Sheriff Blankenship stopped the red Grand Am at the intersection of Eisenhower and MacArthur by turning on his emergency lights or "wigwags." He also had red, white and blue LED lights on his dash. It is to be noted that the name "County Road 7300" becomes "Eisenhower." The red Grand Am pulled over to the south side of Eisenhower. Defendant introduced photos of the road and defendant's direction of travel. Def.Ex.A.

Sheriff Blankenship approached the car and asked the driver for his driver's license and proof of insurance. Sheriff Blankenship identified the driver of the car as defendant Timothy Parsons. When defendant gave Sheriff Blankenship his Pennsylvania driver's license his hands were shaking "pretty badly." Sheriff Blankenship waited a few seconds to evaluate defendant's degree of nervousness. Sheriff Blankenship believed defendant to be "extremely nervous." When asked

for the Proof of Insurance defendant said the car was a rental and provided the rental contract. Again, defendant was shaking. The rental agreement showed the vehicle was rented at the Orange County, California airport.

Sheriff Blankenship asked defendant if he was going back to Pennsylvania and defendant replied that he was. Sheriff Blankenship asked defendant how he got to California because the vehicle was rented in California. Defendant said he flew to California. Sheriff Blankenship thought this was unusual because it is much more cost effective to fly round trip rather than fly one way then rent a vehicle and pay for motels and fuel for the return trip. Sheriff Blankenship asked why defendant was driving back and defendant replied he had to drop off construction plans in St. Louis. Sheriff Blankenship asked if he had the plans handy and defendant said he had already dropped them off. Sheriff Blankenship told defendant he had not even reached St. Louis and defendant replied "I meant Little Rock." Little Rock is hundreds of miles south and east of where defendant was stopped. Sheriff Blankenship found it highly unusual that the defendant would go that far south and east then double back to the location of the stop.

Sheriff Blankenship stated that at this point he was reasonably suspicious that criminal activity was afoot for the following reasons:

1. Defendant had exited the Interstate and proceeded down a country road immediately after passing the check point signs. The road has no gas stations or food marts. The only motel is the other way on County Road 7300.

2. Defendant was extremely nervous.

3. Defendant flew cross county to California and drove back alone. The car was rented in Southern California, a source of drugs coming into and through Missouri.

4. Defendant told obvious inconsistencies about dropping off the construction plans. First he said he dropped them in St. Louis which he had not yet reached then changed his story to say he dropped them off in Little Rock.

5. Whether he dropped them in St. Louis or Little Rock he would have had to double back a considerable distance to reach the location of the stop.

Sheriff Blankenship asked defendant if there was any contraband in the car and defendant said no. Sheriff Blankenship asked for consent to search and defendant refused. Sheriff Blankenship got Nitro out of his police vehicle and walked him around defendant's car. Nitro alerted at the trunk area of defendant's car. Nitro's alert is a sit-and-bark type of alert.[3] Sheriff Blankenship testified he has observed Nitro on hundreds of occasion perform his sit-and-bark alert indicating the presence of a narcotic odor.[4] Deputy Ray Pracht arrived in a separate vehicle as Sheriff Blankenship was working the dog. Deputy Pracht ran a computer check on defendant's driver's license.

When Nitro alerted, Sheriff Blankenship opened the trunk. He did not recall if he used the keys or pushed the remote release. The trunk contained a blue milk carton and a locked briefcase. He asked defendant for a key or combination to the briefcase and defendant replied that he did not have the key and did not know the combination. Sheriff Blankenship and Deputy Pracht pried the latch of the briefcase open and found two kilogram sized bricks of cocaine as well as a plastic bag of loose cocaine. It totaled approximately 5.5 pounds of cocaine. Sheriff Blankenship seized the cocaine.

Defendant was placed under arrest and advised of his <u>Miranda</u> rights. Sheriff Blankenship told defendant:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to an attorney. If you can't afford an attorney, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights, not answer any questions or make any statements.

---

[3] There was considerable cross examination about whether Nitro jumped up on the passenger side window and whether this constituted a false alert. Sheriff Blankenship testified he did not recall whether Nitro jumped on the door but he noted that Nitro may jump up if he catches a narcotic's odor, in order to get closer to the odor so he can conduct a further sniff search.

[4] There was also considerable testimony about Nitro's qualifications. Defendant argues he was not properly qualified. Sheriff Blankenship testified he has handled narcotics trained canines for over twelve years. He has used Nitro for five and one half years. In 2000 Nitro received a certificate for training in Arkansas and receives continued testing every couple of months. Sheriff Blankenship did not know if these continued testings are documented. Sheriff Blankenship testified he has never experienced Nitro to alert falsely.

Defendant said he understood his rights. He was not questioned at that time. Defendant was not threatened nor were any promises made to him. He did not appear under the influence of drugs or alcohol. He did not say he wanted an attorney nor did he say he did not want to talk.

Defendant was taken to the Phelps County Jail. Sheriff Blankenship called Detective Kody Lucas to respond to the jail. Detective Lucas has been with the Phelps County Sheriff's Department for approximately three and one half years. Prior to that he was Chief of Police in Edgar Springs, Missouri. When he received the call from Sheriff Blankenship he responded to the jail, which is approximately five miles from the Sugar Tree overpass. Upon arrival he photographed defendant's vehicle, processed it and seized other items of evidence.[5] Construction plans located in defendant's vehicle were also seized. Def.Ex. D and E. Later, a DEA agent arrived and Det. Lucas turned the seized items over to him.

At approximately 6:30 p.m. Det. Lucas took defendant to his office for an interview. Prior to the interview defendant asked and was granted leave to use the restroom and to have a drink of water. In the interview room, Det. Lucas re-advised defendant of his Miranda rights from memory. He told him:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to an attorney. If you cannot afford an attorney one will be appointed to represent you prior to any questioning. You may advise and exercise your rights at any time.

Defendant said he understood his rights and was willing to waive them and to speak to Det. Lucas. Det. Lucas did not threaten defendant nor did he make any promises to him. Generally, defendant said he was told to fly to California, obtain a rental car, go to a shopping center, park the car, go inside the shopping center for a while then return to the car. He was then to park it in the driveway of his residence in Pennsylvania and await further instructions in the mail.

---

[5] The items seized are located on Gov.Ex.1, a Phelps County Sheriff's Office Offense/Incident Report. Seized were an atlas of the United States; a Nextel phone; a Hertz Corporation rental agreement; paperwork from Priceline.com containing information on rental car and airline tickets; receipt from the Days Inn Hotel in El Reno, Oklahoma dated June 18, 2005; a hand-drawn map with highlighted directions leading from Interstate 80 to South Lake Tahoe; an airline ticket stub from America West Airlines dated June 17, 2005 from Pittsburgh to Phoenix; an airline ticket stub from America West Airlines dated June 17, 2005 from Phoenix to Santa Ana; and a tan leather wallet containing Timothy Parsons' identification and numerous ATM receipts.

Det. Lucas said it did not make sense and was not consistent with what defendant had told Sheriff Blankenship. Defendant said "I was nervous as hell at the time." Det. Lucas asked defendant from whom he received his orders and defendant became nervous and said he would like to have an attorney. He was not questioned further and the interview ceased. Prior to that he had not asked for an attorney nor had he said he did not want to talk.

## CONCLUSIONS OF LAW

Defendant argues his Motion to Suppress should be granted on the following grounds:

1.      There was not credible evidence that Sheriff Blankenship stopped defendant for speeding;

2.      Sheriff Blankenship did not have reasonable suspicion or probable cause to justify the continued detention of defendant and his vehicle; and

3.      Sheriff Blankenship's narcotics trained canine was not properly qualified and therefore his alert was insufficient to establish probable cause to search the trunk.


1.      **The Initial Stop**

Sheriff Blankenship, a law enforcement officer for twenty-nine years, testified credibly that he followed defendant approximately two miles on Country Road 7300. He said the speed limit is 45 mile per hour and then drops to 35 miles per hour. Defendant was traveling approximately 45-46 miles per hour but did not slow down when the speed limit decreased. There was no testimony that he "guessed" how fast defendant was going. Sheriff Blankenship said defendant continued to speed for approximately one-half of a mile before being pulled over. Defendant argues that a person would not speed when being followed by a marked police car. As pointed out by the government, this happens hundreds of times every day. The fact that defendant was not given a ticket for speeding is irrelevant.

It is well established that when a police officer observes a traffic violation - - however minor - he has probable cause to stop the vehicle. <u>Whren v. United States</u>, 517 U.S. 806(1996); <u>United States v. Gomez Serena</u>, 368 F.3d 1037, 1040 (8th Cir. 2004) (Police officer can stop vehicle with expired tags); <u>United States v. Foley</u>, 206 F.3d, 802, 805 (8th Cir. 2000); <u>United States v. Bell</u>, 86

F.3d 820 (8th Cir.), cert. denied, 519 U.S. 955 (1996); United States v. Garcia, 23 F.3d 1331, 1334 (8th Cir. 1994); United States v. Ramos, 20 F.3d 348, 351 (8th Cir. 1994); United States v. Miller, 20 F.3d 926 (8th Cir. 1994); United States v. Barahona, 990 F.2d 412 (8th Cir. 1993); United States v. Cummins, 920 F.2d 498, 500 (8th Cir. 1990), cert. denied, 502 U.S. 962 (1991); see Pennsylvania v. Mimms, 434 U.S. 106 (1977); United States v. Pillow, 842 F.2d 1001 (8th Cir. 1988).

The determinative question is not whether the driver committed a traffic violation, but whether an objectively reasonable police officer could have formed a reasonable suspicion that the driver was violating the traffic laws. Even if the officer were mistaken about the existence of a violation, "the validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases, the question is simply whether the mistake, whether of law or fact, was an objectively reasonable one." United States v. Martin, 411 F.3d 998, 1001 (8th Cir. 2005) quoting United States v. Smart, 393 F.3d 767, 770 (8th Cir. 2005).

Here, Sheriff Blankenship did not make a mistake. He observed defendant speeding. His actions were objectively reasonable. Defendant's argument that there is no credible evidence that Sheriff Blankenship stopped defendant for speeding is without merit.

## 2. Detention of Defendant and His Vehicle

Any traffic stop is constitutional no matter the officer's actual motive, so long as the officer had probable cause to believe that a traffic violation actually occurred. United State v. Long, 320 F.3d 795, 798 (8th Cir. 2003). An otherwise valid stop does not become unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity. United States v. Maejia, 928 F.2d 810, 814-15 (8th Cir. 2005).

In other words, the temporary detention of a motorist upon probable cause to believe he has violated the traffic laws does not violate the Fourth Amendment prohibition against unreasonable seizures, even if a reasonable officer would not have stopped the motorist absent some additional law enforcement objective. Whren v. United States, 517 U.S. 806 (1996). Given a lawful initial stop, the issue becomes whether the resulting detention of the defendant is "reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1,

20 (1968); <u>Ramos</u>, 20 F.3d at 351; <u>Barahona</u>, 990 F.2d at 416; <u>Cummins</u>, 920 F.2d at 502. If the officer lacks a reasonable, articuable suspicion to justify the detention, an illegal detention would taint a subsequent consent search. <u>Ramos</u>, 20 F.3d at 352-53.

> For a detention to be reasonable, an officer's questions must relate to the purpose of the stop. …However, if the responses of the detainee in the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.

<u>Barahona</u>, 990 F.2d at 416 (citations omitted).

An officer at a traffic stop can check the driver's identification and vehicle registration, ask the driver to step out of his vehicle and ask routine questions concerning the driver's destination and the purpose of his trip. <u>Long</u>, 320 F.3d at 799. <u>see also</u> <u>Gomez Serena</u>, 368 F.3d at 1040 (a reasonable investigation of a justifiable traffic stop may include checking the driver's license and registration, asking the driver to step out of the vehicle, asking the driver to sit in the patrol car, and requesting the driver's destination and purpose); <u>United States v. Gregory</u>, 302 F.3d 805, 809 (8th Cir. 2002); <u>Ramos</u>, 42 F.3d at 1163.

Here, Sheriff Blankenship asked about defendant's destination, the purpose of his trip and checked his driver's license and the rental agreement. Defendant's answers and nervous behavior gave rise to suspicions. Sheriff Blankenship articulated his reasons for believing criminal activity was afoot: a.) defendant exited the Interstate and went down a relatively unused country road after passing the check point signs; b.) defendant was extremely nervous; c.) defendant had flown cross country to a state which is a source of drugs and then was driving back alone; d.) defendant obviously lied about having dropped off construction plans in St. Louis when he had not yet arrived in St. Louis and then changing his story to say he dropped off the plans in Little Rock.

At this point, the officer "had justification for a greater intrusion unrelated to the traffic offense." <u>United States v. Lyton</u>, 161 F.3d 1168, 1170 (8th Cir. 1998) (inconsistent answers entitle officer "to expand the scope of the stop and ask additional, more intrusive questions") <u>quoting</u> <u>Ramos</u>, 42 F.3d at 1163); <u>Cummins</u>, 920 F.2d at 502. It was reasonable to suspect in light of his

experience that criminal activity may have been afoot.  <u>Terry</u>, 392 U.S. at 30; <u>Cummins</u>, 920 F.2d at 502.

Defendant's attempt to isolate each of the factors articulated by Sheriff Blankenship is clearly improper under the law.  <u>See</u> <u>United States v. Arvizu</u>, 534 U.S. 266, 274 (2002) (holding <u>Terry</u> precludes a "divide and conquer analysis").  When evaluating whether reasonable suspicion exists for an officer to expand the scope of an investigation following a traffic stop, the court must look at the totality of the circumstances in light of the officer's experience.  <u>United States v. Hanlon</u>, 401 F.3d 926, 929 (8th Cir. 2005); <u>Arvizu</u>, 538 U.S. at 274.  Looking at the totality of the circumstances in a particular case means that even a series of acts innocent in themselves may give rise to a reasonable suspicion of criminal activity when taken together.  <u>Arvizu</u>, 534 U.S. at 274 (<u>citing</u> <u>Terry</u>, 392 U.S. at 22).

Under the totality of the circumstances in light of his experience, Sheriff Blankenship had reasonable suspicion to detain defendant and expand the scope of his investigation.

3.      **Narcotics Trained Canine**

It is clear that a dog sniff conducted during a traffic stop that is "lawful at its inception and otherwise executed in a reasonable manner" does not infringe upon a constitutionally protected interest in privacy.  <u>United States v. Martin</u>, 411 F.3d at 1002 <u>quoting</u> <u>Illinois v. Caballes</u>, ____ U.S. ____, 125 S.Ct. 834, 837 (2005).  A dog sniff may be the product of an unconstitutional seizure, however, if the traffic stop is unreasonably prolonged before the dog is employed.  <u>Id</u>.  To establish an unreasonably prolonged detention, a driver must show that he was detained beyond the time justified by the traffic stop, and that the detention was not supported by reasonable suspicion.  <u>Martin</u>, 411 F.3d at 1002.  Here, Nitro was in Sheriff Blankenship's car and Sheriff Blankenship produced him immediately.  There was no prolonged detention.

Defendant argues that Nitro was not properly qualified and that therefore his alert did not provide probable cause for a search of the trunk or briefcase.  Sheriff Blankenship had handled narcotics trained dogs for over twelve years.  He had worked with Nitro for five and one-half years. Nitro received a certificate that he was qualified in 2000 and he received continued testing every

couple of months. Sheriff Blankenship had never known Nitro to alert falsely.[6] The case law cited by the government is on point. See United States v. Delaney, 52 F.3d 182, 188 (8th Cir. 1995) (reliability of dog established when dog was certified, had successfully alerted to drugs fifty times in a three year period and handler had received seventy-six hours of dog handling training; United States v. Sundby, 186 F.3d 873, 876 (8th Cir. 1999) (to establish reliability of dog, evidence need only show dog has been trained and certified, need not show detailed account of dog's track record or education); United States v. Maejia, 928 F.2d 815 (reliability established when evidence establishes the dog has been used in the past with successful results). See also United States v. Ross, 263 F.3d 844, 846 (8th Cir. 2001) (reliability shown even though dog not recently certified). Additionally, Nitro has been found by this district court to be reliable. United States v. Florres, 4:04CR521SNL(FRB).

After the dog alerted to the presence of narcotics, there was probable cause to search the vehicle and, therefore, the automobile exception to the warrant requirement comes into play. United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994). Probable cause means "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). A dog alert, without more, gives probable cause for searches and seizures. Bloomfield, 40 F.3d at 919; Maejia, 928 F.2d at 815 ; United States v. Longbehn, 898 F.2d 635, 640 (8th Cir. 1990). If there is probable cause to believe an automobile contains contraband, a warrantless search of the automobile is reasonable. United States v. Ross, 456 U.S. 798, 809 (1982); Chambers v. Maroney, 399 U.S. 42, 52 (1969). The automobile exception to the warrant requirement includes all containers. Ross, 456 U.S. at 822.

If police have probable cause to search a car, they need not get a warrant first even if they have time and opportunity. United States v. Ludwig, 10 F.3d 1523, 1528 (10th Cir. 1993); United States v. Crabb, 952 F.2d 1245, 1246 (10th Cir. 1991), cert. denied, 112 S.Ct. 1981 (1992).

---

[6]     Defendant suggest that Nitro's jumping at the passenger side window constituted some form of false alert. Sheriff Blankenship did not recall whether Nitro jumped but even if Nitro did jump, Sheriff Blankenship testified clearly that when Nitro catches a narcotic odor he sometimes jumps up to pursue a further sniff search. Nitro's alert is a sit-and-bark, which he did at the trunk of the car.

In the present case, the searches of the trunk and of the briefcase were lawful and the cocaine should not be suppressed.

**4.    Statements**

Although defendant did not challenge the admission of his statements in his post-hearing brief, his original Motion to Suppress does deal with statements in general, boilerplate fashion to the effect that any statements were the result of defendant's illegal arrest and the violation of defendant's Fifth Amendment rights.  First, defendant's arrest was completely lawful.  After the cocaine was lawfully discovered defendant was placed under arrest.  Law enforcement officers may arrest a person without a warrant if they have probable cause to believe that the person has committed or was committing a crime.  <u>Gerstein v. Pugh</u>, 420 U.S. 103 (1975); <u>United States v. Watson</u>, 423 U.S. 411 (1976).  Probable cause for arrest exists if at the time of the arrest the facts and circumstances within the knowledge of the officers and of which they had reasonable trustworthy information were sufficient to warrant a prudent man in believing that the person had committed or was committing an offense.  <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964).  <u>See</u> <u>also</u> R.S.Mo § 544.216 (a municipal law enforcement officer may arrest on view without a warrant any person about whom he has reasonable grounds to believe has violated any law of this state).  Defendant was arrested because Sheriff Blankenship had probable cause to believe that he possessed cocaine. Secondly, defendant was fully advised of his <u>Miranda</u> rights at the scene and not questioned at that time.  Defendant was again advised of his <u>Miranda</u> rights at the Phelps County Jail.  A defendant may knowingly and intelligently waive his rights and agree to answer questions.  <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966).  When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing and intelligent waiver of the <u>Miranda</u> rights by the defendant.  <u>Colorado v. Connelly</u>, 479 U.S. 157 (1986).  "The requirement that <u>Miranda</u> warnings be given does not, of course, dispense with the voluntariness inquiry" <u>Dickerson v. United States</u>, 530 U.S. 428, 444 (2000).  The court must look to the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and

deliberate choice, rather than intimidation, coercion, or deception; and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. Moran v. Burbine, 475 U.S. 412 (1986).

The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. Haynes v. Washington, 373 U.S. 503 (1963); Colorado v. Connelly, 479 U.S. at 170. However, as the Supreme Court stated in Berkemer v. McCarthy, 468 U.S. 420 (1984), "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda are rare." Id. at 433 n. 20; Dickerson, 530 U.S. at 444. This is not one of the "rare" case to which Berkemer refers. Defendant's statements should not be suppressed.

Accordingly,

IT IS HEREBY RECOMMENDED that Defendant's Motion to Suppress Evidence and Statements be DENIED. [Doc. 23]

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).


/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE


Dated this   2nd    day of November, 2005.

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )     Case No. 4:05CR355ERW(MLM) |
| | ) |
| TIMOTHY PARSONS, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the court on Defendant's Motion to Suppress Evidence and Statements. [Doc. 23] The government filed a written Response. [Doc. 26] On 9/28/05 the court held an Evidentiary Hearing on the Motion. Following the Hearing, defendant requested and was granted to 10/14/05 to file a Supplemental Memorandum in Support of the Motion. [Doc. 31] The government filed a Supplemental Response. [Doc. 32]

At the hearing the government presented the testimony of Sheriff Donald Blankenship and Detective Kody Lucas, both of the Phelps County Sheriffs Department. The defendant did not present testimony but introduced several exhibits.[1] Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT[2]

Sheriff Blankenship testified that prior to his seventeen years as Sheriff of the Phelps County Sheriff's Department, he had twelve years of law enforcement experience. In his present capacity he supervises approximately sixty people and supervises the operation of the Sheriff's Department including law enforcement, process service, the jail and court security. During his twenty-nine years

---

[1]     Because the court file is electronic rather than in paper form, the undersigned has returned these exhibits to defense counsel. They are available to the district court for review in connection with this R&R, if requested.

[2]     The transcript of the Evidentiary Hearing is Document 29.

of law enforcement, he has made thousands of traffic stops. He has used narcotics trained canines since 1993. His present canine is "Nitro" who has been with him since 2000.

On June 19, 2005 Sheriff Blankenship was on duty in the late afternoon on the north side of I-44 at the Sugar Tree overpass. The Sheriff's Department has two sets of signs that are placed facing eastbound traffic, one on each side of the Interstate just prior to the Sugar Tree exit. The first says "Checkpoint Ahead, 1/4 mile." The second set says "Drug Dogs in Use." Both signs are in English and Spanish.

Sheriff Blankenship was in uniform on the north side of I-44 in a fully marked patrol car without roof lights but with decals reading "Sheriff" and "Canine" and a phone number.

At approximately 4:15 P.M. a red Pontiac Grand Am with Nevada license plates exited the Sugar Tree exit. It stopped at the top of the ramp then turned right. The road is known as Country Road 7300. Sheriff Blankenship ran the license plate and learned it was a Hertz rental. He followed the vehicle approximately two miles. The male driver was the only occupant of the car. The posted speed limit on the first stretch of the road (approximately 1-1/2 miles) is 45 miles per hour; later it is posted at 35 miles per hour. During the first stretch of the road the defendant was going approximately 45-46 miles per hour and continued at that speed even after it was posted at 35 miles per hour. It is a violation of Missouri Law to exceed a speed limit. R.S.Mo. § 304.010. Sheriff Blankenship stopped the red Grand Am at the intersection of Eisenhower and MacArthur by turning on his emergency lights or "wigwags." He also had red, white and blue LED lights on his dash. It is to be noted that the name "County Road 7300" becomes "Eisenhower." The red Grand Am pulled over to the south side of Eisenhower. Defendant introduced photos of the road and defendant's direction of travel. Def.Ex.A.

Sheriff Blankenship approached the car and asked the driver for his driver's license and proof of insurance. Sheriff Blankenship identified the driver of the car as defendant Timothy Parsons. When defendant gave Sheriff Blankenship his Pennsylvania driver's license his hands were shaking "pretty badly." Sheriff Blankenship waited a few seconds to evaluate defendant's degree of nervousness. Sheriff Blankenship believed defendant to be "extremely nervous." When asked

for the Proof of Insurance defendant said the car was a rental and provided the rental contract. Again, defendant was shaking. The rental agreement showed the vehicle was rented at the Orange County, California airport.

Sheriff Blankenship asked defendant if he was going back to Pennsylvania and defendant replied that he was. Sheriff Blankenship asked defendant how he got to California because the vehicle was rented in California. Defendant said he flew to California. Sheriff Blankenship thought this was unusual because it is much more cost effective to fly round trip rather than fly one way then rent a vehicle and pay for motels and fuel for the return trip. Sheriff Blankenship asked why defendant was driving back and defendant replied he had to drop off construction plans in St. Louis. Sheriff Blankenship asked if he had the plans handy and defendant said he had already dropped them off. Sheriff Blankenship told defendant he had not even reached St. Louis and defendant replied "I meant Little Rock." Little Rock is hundreds of miles south and east of where defendant was stopped. Sheriff Blankenship found it highly unusual that the defendant would go that far south and east then double back to the location of the stop.

Sheriff Blankenship stated that at this point he was reasonably suspicious that criminal activity was afoot for the following reasons:

1. Defendant had exited the Interstate and proceeded down a country road immediately after passing the check point signs. The road has no gas stations or food marts. The only motel is the other way on County Road 7300.

2. Defendant was extremely nervous.

3. Defendant flew cross county to California and drove back alone. The car was rented in Southern California, a source of drugs coming into and through Missouri.

4. Defendant told obvious inconsistencies about dropping off the construction plans. First he said he dropped them in St. Louis which he had not yet reached then changed his story to say he dropped them off in Little Rock.

5. Whether he dropped them in St. Louis or Little Rock he would have had to double back a considerable distance to reach the location of the stop.

Sheriff Blankenship asked defendant if there was any contraband in the car and defendant said no. Sheriff Blankenship asked for consent to search and defendant refused. Sheriff Blankenship got Nitro out of his police vehicle and walked him around defendant's car. Nitro alerted at the trunk area of defendant's car. Nitro's alert is a sit-and-bark type of alert.[3] Sheriff Blankenship testified he has observed Nitro on hundreds of occasion perform his sit-and-bark alert indicating the presence of a narcotic odor.[4] Deputy Ray Pracht arrived in a separate vehicle as Sheriff Blankenship was working the dog. Deputy Pracht ran a computer check on defendant's driver's license.

When Nitro alerted, Sheriff Blankenship opened the trunk. He did not recall if he used the keys or pushed the remote release. The trunk contained a blue milk carton and a locked briefcase. He asked defendant for a key or combination to the briefcase and defendant replied that he did not have the key and did not know the combination. Sheriff Blankenship and Deputy Pracht pried the latch of the briefcase open and found two kilogram sized bricks of cocaine as well as a plastic bag of loose cocaine. It totaled approximately 5.5 pounds of cocaine. Sheriff Blankenship seized the cocaine.

Defendant was placed under arrest and advised of his <u>Miranda</u> rights. Sheriff Blankenship told defendant:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to an attorney. If you can't afford an attorney, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights, not answer any questions or make any statements.

---

[3] There was considerable cross examination about whether Nitro jumped up on the passenger side window and whether this constituted a false alert. Sheriff Blankenship testified he did not recall whether Nitro jumped on the door but he noted that Nitro may jump up if he catches a narcotic's odor, in order to get closer to the odor so he can conduct a further sniff search.

[4] There was also considerable testimony about Nitro's qualifications. Defendant argues he was not properly qualified. Sheriff Blankenship testified he has handled narcotics trained canines for over twelve years. He has used Nitro for five and one half years. In 2000 Nitro received a certificate for training in Arkansas and receives continued testing every couple of months. Sheriff Blankenship did not know if these continued testings are documented. Sheriff Blankenship testified he has never experienced Nitro to alert falsely.

Defendant said he understood his rights. He was not questioned at that time. Defendant was not threatened nor were any promises made to him. He did not appear under the influence of drugs or alcohol. He did not say he wanted an attorney nor did he say he did not want to talk.

Defendant was taken to the Phelps County Jail. Sheriff Blankenship called Detective Kody Lucas to respond to the jail. Detective Lucas has been with the Phelps County Sheriff's Department for approximately three and one half years. Prior to that he was Chief of Police in Edgar Springs, Missouri. When he received the call from Sheriff Blankenship he responded to the jail, which is approximately five miles from the Sugar Tree overpass. Upon arrival he photographed defendant's vehicle, processed it and seized other items of evidence.[5] Construction plans located in defendant's vehicle were also seized. Def.Ex. D and E. Later, a DEA agent arrived and Det. Lucas turned the seized items over to him.

At approximately 6:30 p.m. Det. Lucas took defendant to his office for an interview. Prior to the interview defendant asked and was granted leave to use the restroom and to have a drink of water. In the interview room, Det. Lucas re-advised defendant of his Miranda rights from memory. He told him:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to an attorney. If you cannot afford an attorney one will be appointed to represent you prior to any questioning. You may advise and exercise your rights at any time.

Defendant said he understood his rights and was willing to waive them and to speak to Det. Lucas. Det. Lucas did not threaten defendant nor did he make any promises to him. Generally, defendant said he was told to fly to California, obtain a rental car, go to a shopping center, park the car, go inside the shopping center for a while then return to the car. He was then to park it in the driveway of his residence in Pennsylvania and await further instructions in the mail.

---

[5] The items seized are located on Gov.Ex.1, a Phelps County Sheriff's Office Offense/Incident Report. Seized were an atlas of the United States; a Nextel phone; a Hertz Corporation rental agreement; paperwork from Priceline.com containing information on rental car and airline tickets; receipt from the Days Inn Hotel in El Reno, Oklahoma dated June 18, 2005; a hand-drawn map with highlighted directions leading from Interstate 80 to South Lake Tahoe; an airline ticket stub from America West Airlines dated June 17, 2005 from Pittsburgh to Phoenix; an airline ticket stub from America West Airlines dated June 17, 2005 from Phoenix to Santa Ana; and a tan leather wallet containing Timothy Parsons' identification and numerous ATM receipts.

Det. Lucas said it did not make sense and was not consistent with what defendant had told Sheriff Blankenship. Defendant said "I was nervous as hell at the time." Det. Lucas asked defendant from whom he received his orders and defendant became nervous and said he would like to have an attorney. He was not questioned further and the interview ceased. Prior to that he had not asked for an attorney nor had he said he did not want to talk.

## CONCLUSIONS OF LAW

Defendant argues his Motion to Suppress should be granted on the following grounds:

1.       There was not credible evidence that Sheriff Blankenship stopped defendant for speeding;

2.       Sheriff Blankenship did not have reasonable suspicion or probable cause to justify the continued detention of defendant and his vehicle; and

3.       Sheriff Blankenship's narcotics trained canine was not properly qualified and therefore his alert was insufficient to establish probable cause to search the trunk.


### 1.       The Initial Stop

Sheriff Blankenship, a law enforcement officer for twenty-nine years,  testified credibly that he followed defendant approximately two miles on Country Road 7300.  He said the speed limit is 45 mile per hour and then drops to 35 miles per hour.  Defendant was traveling approximately 45-46 miles per hour but did not slow down when the speed limit decreased.  There was no testimony that he "guessed" how fast defendant was going.  Sheriff Blankenship said defendant continued to speed for approximately one-half of a mile before being pulled over.  Defendant argues that a person would not speed when being followed by a marked police car.  As pointed out by the government, this happens hundreds of times every day.   The fact that defendant was not given a ticket for speeding is irrelevant.

It is well established that when a police officer observes a traffic violation - - however minor - he has probable cause to stop the vehicle.  <u>Whren v. United States</u>, 517 U.S. 806(1996);   <u>United States v. Gomez Serena</u>, 368 F.3d 1037, 1040 (8th Cir. 2004) (Police officer can stop vehicle with expired tags);  <u>United States v. Foley</u>, 206 F.3d, 802, 805 (8th Cir. 2000); <u>United States v. Bell</u>, 86

F.3d 820 (8th Cir.), cert. denied, 519 U.S. 955 (1996); United States v. Garcia, 23 F.3d 1331, 1334 (8th Cir. 1994); United States v. Ramos, 20 F.3d 348, 351 (8th Cir. 1994); United States v. Miller, 20 F.3d 926 (8th Cir. 1994); United States v. Barahona, 990 F.2d 412 (8th Cir. 1993); United States v. Cummins, 920 F.2d 498, 500 (8th Cir. 1990), cert. denied, 502 U.S. 962 (1991); see Pennsylvania v. Mimms, 434 U.S. 106 (1977); United States v. Pillow, 842 F.2d 1001 (8th Cir. 1988).

The determinative question is not whether the driver committed a traffic violation, but whether an objectively reasonable police officer could have formed a reasonable suspicion that the driver was violating the traffic laws. Even if the officer were mistaken about the existence of a violation, "the validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases, the question is simply whether the mistake, whether of law or fact, was an objectively reasonable one." United States v. Martin, 411 F.3d 998, 1001 (8th Cir. 2005) quoting United States v. Smart, 393 F.3d 767, 770 (8th Cir. 2005).

Here, Sheriff Blankenship did not make a mistake. He observed defendant speeding. His actions were objectively reasonable. Defendant's argument that there is no credible evidence that Sheriff Blankenship stopped defendant for speeding is without merit.

## 2.      Detention of Defendant and His Vehicle

Any traffic stop is constitutional no matter the officer's actual motive, so long as the officer had probable cause to believe that a traffic violation actually occurred. United State v. Long, 320 F.3d 795, 798 (8th Cir. 2003). An otherwise valid stop does not become unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity. United States v. Maejia, 928 F.2d 810, 814-15 (8th Cir. 2005).

In other words, the temporary detention of a motorist upon probable cause to believe he has violated the traffic laws does not violate the Fourth Amendment prohibition against unreasonable seizures, even if a reasonable officer would not have stopped the motorist absent some additional law enforcement objective. Whren v. United States, 517 U.S. 806 (1996). Given a lawful initial stop, the issue becomes whether the resulting detention of the defendant is "reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1,

20 (1968);<u>Ramos</u>, 20 F.3d at 351; <u>Barahona</u>, 990 F.2d at 416; <u>Cummins</u>, 920 F.2d at 502.  If the officer lacks a reasonable, articuable suspicion to justify the detention, an illegal detention would taint a subsequent consent search.  <u>Ramos</u>, 20 F.3d at 352-53.

> For a detention to be reasonable, an officer's questions must relate to the purpose of the stop. ...However, if the responses of the detainee in the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.

<u>Barahona</u>, 990 F.2d at 416 (citations omitted).

An officer at a traffic stop can check the driver's identification and vehicle registration, ask the driver to step out of his vehicle and ask routine questions concerning the driver's destination and the purpose of his trip.  <u>Long</u>, 320 F.3d at 799.  <u>see also</u> <u>Gomez Serena</u>, 368 F.3d at 1040 (a reasonable investigation of a justifiable traffic stop may include checking the driver's license and registration, asking the driver to step out of the vehicle, asking the driver to sit in the patrol car, and requesting the driver's destination and purpose); <u>United States v. Gregory</u>, 302 F.3d 805, 809 (8th Cir. 2002);<u>Ramos</u>, 42 F.3d at 1163.

Here, Sheriff Blankenship asked about defendant's destination, the purpose of his trip and checked his driver's license and the rental agreement.  Defendant's answers and nervous behavior gave rise to suspicions.  Sheriff Blankenship articulated his reasons for believing criminal activity was afoot:  a.) defendant exited the Interstate and went down a relatively unused country road after passing the check point signs; b.) defendant was extremely nervous; c.) defendant had flown cross country to a state which is a source of drugs and then was driving back alone; d.) defendant obviously lied about having dropped off construction plans in St. Louis when he had not yet arrived in St. Louis and then changing his story to say he dropped off the plans in Little Rock.

At this point, the officer "had justification for a greater intrusion unrelated to the traffic offense."  <u>United States v. Lyton</u>, 161 F.3d 1168, 1170 (8th Cir. 1998) (inconsistent answers entitle officer "to expand the scope of the stop and ask additional, more intrusive questions") <u>quoting</u> <u>Ramos</u>, 42 F.3d at 1163);  <u>Cummins</u>, 920 F.2d at 502.  It was reasonable to suspect in light of his

experience that criminal activity may have been afoot.  <u>Terry</u>, 392 U.S. at 30; <u>Cummins</u>, 920 F.2d at 502.

Defendant's attempt to isolate each of the factors articulated by Sheriff Blankenship is clearly improper under the law.  <u>See</u> <u>United States v. Arvizu</u>, 534 U.S. 266, 274 (2002) (holding <u>Terry</u> precludes a "divide and conquer analysis").  When evaluating whether reasonable suspicion exists for an officer to expand the scope of an investigation following a traffic stop, the court must look at the totality of the circumstances in light of the officer's experience.  <u>United States v. Hanlon</u>, 401 F.3d 926, 929 (8th Cir. 2005); <u>Arvizu</u>, 538 U.S. at 274.  Looking at the totality of the circumstances in a particular case means that even a series of acts innocent in themselves may give rise to a reasonable suspicion of criminal activity when taken together.  <u>Arvizu</u>, 534 U.S. at 274 (<u>citing</u> <u>Terry</u>, 392 U.S. at 22).

Under the totality of the circumstances in light of his experience, Sheriff Blankenship had reasonable suspicion to detain defendant and expand the scope of his investigation.

3.    **Narcotics Trained Canine**

It is clear that a dog sniff conducted during a traffic stop that is "lawful at its inception and otherwise executed in a reasonable manner" does not infringe upon a constitutionally protected interest in privacy.  <u>United States v. Martin</u>, 411 F.3d at 1002 <u>quoting</u> <u>Illinois v. Caballes</u>, ____ U.S. ____, 125 S.Ct. 834, 837 (2005).  A dog sniff may be the product of an unconstitutional seizure, however, if the traffic stop is unreasonably prolonged before the dog is employed.  <u>Id</u>.  To establish an unreasonably prolonged detention, a driver must show that he was detained beyond the time justified by the traffic stop, and that the detention was not supported by reasonable suspicion.  <u>Martin</u>, 411 F.3d at 1002.  Here, Nitro was in Sheriff Blankenship's car and Sheriff Blankenship produced him immediately.  There was no prolonged detention.

Defendant argues that Nitro was not properly qualified and that therefore his alert did not provide probable cause for a search of the trunk or briefcase.  Sheriff Blankenship had handled narcotics trained dogs for over twelve years.  He had worked with Nitro for five and one-half years.  Nitro received a certificate that he was qualified in 2000 and he received continued testing every

couple of months. Sheriff Blankenship had never known Nitro to alert falsely.[6] The case law cited by the government is on point. See United States v. Delaney, 52 F.3d 182, 188 (8th Cir. 1995) (reliability of dog established when dog was certified, had successfully alerted to drugs fifty times in a three year period and handler had received seventy-six hours of dog handling training; United States v. Sundby, 186 F.3d 873, 876 (8th Cir. 1999) (to establish reliability of dog, evidence need only show dog has been trained and certified, need not show detailed account of dog's track record or education); United States v. Maejia, 928 F.2d 815 (reliability established when evidence establishes the dog has been used in the past with successful results). See also United States v. Ross, 263 F.3d 844, 846 (8th Cir. 2001) (reliability shown even though dog not recently certified). Additionally, Nitro has been found by this district court to be reliable. United States v. Florres, 4:04CR521SNL(FRB).

After the dog alerted to the presence of narcotics, there was probable cause to search the vehicle and, therefore, the automobile exception to the warrant requirement comes into play. United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994). Probable cause means "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). A dog alert, without more, gives probable cause for searches and seizures. Bloomfield, 40 F.3d at 919; Maejia, 928 F.2d at 815 ; United States v. Longbehn, 898 F.2d 635, 640 (8th Cir. 1990). If there is probable cause to believe an automobile contains contraband, a warrantless search of the automobile is reasonable. United States v. Ross, 456 U.S. 798, 809 (1982); Chambers v. Maroney, 399 U.S. 42, 52 (1969). The automobile exception to the warrant requirement includes all containers. Ross, 456 U.S. at 822.

If police have probable cause to search a car, they need not get a warrant first even if they have time and opportunity. United States v. Ludwig, 10 F.3d 1523, 1528 (10th Cir. 1993); United States v. Crabb, 952 F.2d 1245, 1246 (10th Cir. 1991), cert. denied, 112 S.Ct. 1981 (1992).

---

[6]     Defendant suggest that Nitro's jumping at the passenger side window constituted some form of false alert. Sheriff Blankenship did not recall whether Nitro jumped but even if Nitro did jump, Sheriff Blankenship testified clearly that when Nitro catches a narcotic odor he sometimes jumps up to pursue a further sniff search. Nitro's alert is a sit-and-bark, which he did at the trunk of the car.

In the present case, the searches of the trunk and of the briefcase were lawful and the cocaine should not be suppressed.

### 4.    Statements

Although defendant did not challenge the admission of his statements in his post-hearing brief, his original Motion to Suppress does deal with statements in  general, boilerplate fashion to the effect that any statements were the result of defendant's illegal arrest and the violation of defendant's Fifth Amendment rights.  First, defendant's arrest was completely lawful.  After the cocaine was lawfully discovered defendant was placed under arrest.  Law enforcement officers may arrest a person without a warrant if they have probable cause to believe that the person has committed or was committing a crime.  Gerstein v. Pugh, 420 U.S. 103 (1975); United States v. Watson, 423 U.S. 411 (1976).  Probable cause for arrest exists if at the time of the arrest the facts and circumstances within the knowledge of the officers and of which they had reasonable trustworthy information were sufficient to warrant a prudent man in believing that the person had committed or was committing an offense.  Beck v. Ohio, 379 U.S. 89, 91 (1964).  See also R.S.Mo § 544.216 (a municipal law enforcement officer may arrest on view without a warrant any person about whom he has reasonable grounds to believe has violated any law of this state).  Defendant was arrested because Sheriff Blankenship had probable cause to believe that he possessed cocaine. Secondly, defendant was fully advised of his Miranda rights at the scene and not questioned at that time.  Defendant was again advised of his Miranda rights at the Phelps County Jail.  A defendant may knowingly and intelligently waive his rights and agree to answer questions.  Miranda v. Arizona, 384 U.S. 436, 479 (1966).  When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing and intelligent waiver of the Miranda rights by the defendant.  Colorado v. Connelly, 479 U.S. 157 (1986).  "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry" Dickerson v. United States, 530 U.S. 428, 444 (2000).  The court must look to the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and

deliberate choice, rather than intimidation, coercion, or deception; and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. Moran v. Burbine, 475 U.S. 412 (1986).

The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. Haynes v. Washington, 373 U.S. 503 (1963); Colorado v. Connelly, 479 U.S. at 170. However, as the Supreme Court stated in Berkemer v. McCarthy, 468 U.S. 420 (1984), "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda are rare." Id. at 433 n. 20; Dickerson, 530 U.S. at 444. This is not one of the "rare" case to which Berkemer refers. Defendant's statements should not be suppressed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements be **DENIED.** [Doc. 23]

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).


/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE


Dated this   2nd    day of November, 2005.